UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

JON WENC,
           Plaintiff,

      v.                                         CASE NO. 3:14-cv-0840 (VAB)

NEW LONDON BOARD OF
EDUCATION,
           Defendant.

**RULING ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT
AND DEFENDANT'S SECOND MOTION TO AMEND THE ANSWER**

Plaintiff, Jon Wenc, works as a teacher for the Defendant, the New London Board of

Education (the "Board"). In this lawsuit, Mr. Wenc claims that the Board discriminated against

him on the basis of his disability by refusing to provide him with a reasonable accommodation in

violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Connecticut

Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* Am. Compl. at Counts One

and Three, ECF No. 19. He also contends that the Board retaliated against him in violation of

these same statutes. Am. Compl. at Counts Two and Four, ECF No. 19.

The Board has moved for summary judgment on all of Mr. Wenc's claims. Def.'s Mot.

for Summ. J., ECF No. 77. Mr. Wenc has cross-moved for summary judgment on his reasonable

accommodation claims only, under both the ADA and CFEPA. Pl.'s Mot. for Summ. J., ECF

No. 79. The Board also has filed a motion to amend its Answer to add an affirmative defense,

because Mr. Wenc claimed worker's compensation benefits, during the same time the Board

allegedly discriminated and retaliated against him. Second Mot. for Leave to File Second Am.

Answer, ECF No. 99.

1

For the reasons that follow, the Court grants summary judgment in the Board's favor on all of Mr. Wenc's claims. Because the Court grants summary judgment for the Board, it denies as moot the Board's request to amend its Answer.

## I.    Statement of Facts[1]

In 1990, both of Mr. Wenc's legs were crushed in a car accident. Pl.'s Local Rule 56(a)1 Stmt. ¶ 21, ECF No. 79-2; Def.'s Local Rule 56(a)1 Stmt. ¶ 15. As a result of the accident, Mr. Wenc's left leg was amputated above the knee and his right leg underwent several reconstructive surgeries and multiple skin grafts. Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 19-21, ECF No. 79-2; Def.'s Local Rule 56(a)1 Stmt. ¶ 18. Mr. Wenc now uses a prosthesis on his left leg. Def.'s Local Rule 56(a)1 Stmt. ¶¶ 19-20. On occasion, he also has suffered from blisters, cysts, ulcers, and lesions on his amputation stump. *See e.g.*, Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 27, 87, ECF No. 79-2; Def.'s Local Rule 56(a)1 Stmt. ¶ 68; Pl.'s Exs. 14-24, Letters from Dr. Bentz; Def.'s Ex. K, Bentz Dep.; Def.'s Ex. B, Wenc Dep. 51:13-52:5 (testifying that he had lesions that failed to heal for several years). Mr. Wenc also has limited mobility in his right leg and suffers from ongoing pain there. Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 28-30, ECF No. 79-2; Pl.'s Ex. 1, Wenc Dep. 36:23-38:5, ECF No. 79-4.

Mr. Wenc testified that his injuries impact his "entire range of motion" and that, at times, he does not feel well enough to walk at all. Def.'s Ex. B, Wenc Dep. 40:5-42:1 (discussing the impact of his injuries on his mobility, including that on occasion, he was unable to walk because of either pain or limited mobility in his right or left legs, lesions or blisters, or lower back issues). He also testified that he managed his condition by sitting as much as possible and that he declined to use a wheelchair, because he did not "want to become dependent upon it," and

---

[1] The Board filed its Motion for Summary Judgment manually under seal; thus, its supporting documents do not correspond to particular docket numbers.

declined to use crutches because they limited his mobility and he was embarrassed by them.  *Id.* at 42:4-17, 149:16-150:7, 222:10-223:15.  The Board contests that the record supports Mr. Wenc's description of the nature and extent of some of his injuries, but it does not dispute that Mr. Wenc is an amputee with limited mobility.  Def.'s Local Rule 56(a)2 Stmt. ¶¶ 23-33, ECF No. 89-1.

In October 2003, Mr. Wenc began working at the Board as a fifth grade teacher at Nathan Hale Elementary School.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 11-12, ECF No. 79-2. He has been certified by Connecticut's Department of Education to teach kindergarten through sixth grade since April 28, 2011.  Pl.'s Ex. 46, Certification Record from Connecticut Department of Education, ECF No.79-49.  During his teaching career, the Board transferred Mr. Wenc to teach first grade several times.

In this case, the core issue is whether Mr. Wenc's disability made him less physically suited to teaching first grade, as opposed to fifth or sixth grade.  While teaching first grade, Mr. Wenc made several requests to be transferred to teach sixth grade, because he found working in a first grade classroom more physically demanding.  *See e.g.*, Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 34-44, 60, 62, ECF No. 79-2.  He contends that he experienced pain while teaching first grade and had trouble with his legs.  *See e.g.*, *id.* ¶¶ 39-40, 62.  He also contends that teaching first grade created blisters and lesions on his amputation stump, which required him to seek medical leave on occasion.  *See e.g.*, *id.* ¶ 62; Def.'s Ex. I, E-mail dated June 11, 2008 ("The physical nature of the [first] grade position requires me to move in certain ways that creates blisters from my prosthetic limb.  In addition to causing significant discomfort, it has at times required requests for days off so that these blisters can heal or for me to seek medical attention for adjustments to my prosthetic limb."); Def.'s Ex. LL, Letter dated June 7, 2012 (teaching first grade "has led to

continued ulcers on my amputated left limb, painful blisters, potential infection, and ensuing complications in over-compensating on a severely compromised right leg.").  He also believes that the physical problems he experienced while teaching first grade may have affected his performance negatively.  *See e.g.*, Def.'s Ex. B, Wenc Dep. 109:2-20.

The Board disagrees that teaching first grade is more physically demanding than fifth or sixth grades and argues that there is no evidence that Mr. Wenc suffered physically while teaching first grade.  Def.'s Local Rule 56(a)2 Stmt. ¶¶ 38-39, ECF No. 89-1.  However, it admits that, generally speaking, first grade teachers need to provide different types of assistance to their students than fifth or sixth grade teachers, including tying shoes, aiding the children in using the bathroom, sitting with them on the floor, and picking up backpacks.  *Id.* ¶¶ 41-44; Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 41-44, ECF No. 79-2.  The Board contends that any physical injuries Mr. Wenc suffered were not caused by teaching first grade, but rather by an ill-fitting prosthetic limb and Mr. Wenc's failure to follow his doctor's instructions by traveling while he was out on medical leave.  *See e.g.*, Def.'s Mot. for Summ. J. Br. 7 (noting that Dr. Bentz testified that having an ill-fitting prosthetic contributed to his injuries), 11-12, 33 (discussing trips to New York City taken while Mr. Wenc was out on medical leave).  The Board also argues that if Mr. Wenc had used crutches or a wheelchair, he would have been more physically able to teach first grade.  *See* Def.'s Mot. for Summ. J. Br. 30, 33.

### A. Timeframe of Mr. Wenc's Claims

The ADA and CFEPA require a prospective plaintiff to exhaust his or her administrative remedies prior to filing a lawsuit in federal court.  *See* 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement provisions, including the exhaustion requirement in 42 U.S.C. § 2000e-5(e), into the ADA); *Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001) (discussing Title VII's

exhaustion requirement); *Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 105, 114 (D. Conn. 2006) (applying Title VII's exhaustion requirement to ADA claims); Conn. Gen. Stat. § 46a-82(f) (CFEPA's exhaustion provision); *Gauba v. Travelers Rental Co.*, No. 3:12-cv-1713 (SRU), 2015 WL 1004309, at *4 (D. Conn. Mar. 5, 2015) (discussing CFEPA's exhaustion requirements).

To exhaust administrative remedies under the ADA, a plaintiff must file a complaint with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the allegedly illegal action or actions, or within 300 days if the complaint is filed with the EEOC's local equivalent. 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1) ("[I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice… such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred"). To do so under CFEPA, a plaintiff must file a complaint with the Commission on Human Rights and Opportunities ("CHRO") within 180 days of the allegedly discriminatory conduct. Conn. Gen. Stat. § 46a-82(f) ("Any complaint filed pursuant to this section must be filed within one hundred and eighty days after the alleged act of discrimination . . . .").

These exhaustion provisions operate like statutes of limitations, which are calculated looking backwards from the date of the filing of the administrative complaint. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) (holding that Title VII's exhaustion provision operates like a statute of limitations, barring claims based on discrete acts of discrimination or retaliation that occurred outside of the relevant time period); *Gauba*, 2015 WL 1004309, at *4 (holding the same with respect to CFEPA's administrative exhaustion requirement and explaining that the limitations period is calculated by looking back from the

date of the administrative complaint).  In other words, subject to certain exceptions that do not

apply here, the Court cannot consider a defendant's conduct prior to these limitation periods in

assessing liability under the ADA or CFEPA.  *See Morgan*, 536 U.S. at 114 (holding that where

a Title VII lawsuit is based on discrete acts of discrimination, like denial of a transfer, only acts

that occurred 300 days before plaintiff filed his administrative complaint are actionable in the

federal lawsuit); *Gauba*, 2015 WL 1004309, at *4  ("If the plaintiff's complaint alleges that the

employer engaged in discrete acts of discriminatory conduct, he may only seek adjudication on

those allegedly discriminatory acts that occurred within the relevant look-back period—in this

case, 180 days from the date he filed his administrative complaint.") (internal quotation marks

and citation omitted).

　　　Mr. Wenc filed a complaint with the EEOC and CHRO on December 13, 2012.  Pl.'s

Local Rule 56(a)1 Stmt. ¶ 147, ECF No. 79-2.  The parties also signed tolling agreements on

September 26, 2012 and November 8, 2012, in which the Board waived all statute of limitations

defenses from September 21 to December 17, 2012.  Pl.'s Opp. Br. 6, ECF No. 93; Pl.'s Ex. 61,

Tolling Agreement, ECF No. 93-16; Pl.'s Ex. 62, Tolling Agreement, ECF No. 93-17.  As a

result of the tolling agreements, the parties have agreed that Mr. Wenc's lawsuit may only be

premised on the Board's actions after November 26, 2011 with respect to his ADA claims and

after March 25, 2012 with respect to his CFEPA claims.  Pl.'s Opp. Br. 6, ECF No. 93; Def.'s

Reply Br. 2, ECF No. 105.  Thus, any description of events that occurred before either of those

two timeframes is only provided for context and may not form the basis of the Board's liability.

### B.  Factual Background to Mr. Wenc's Claims

The below chart summarizes Mr. Wenc employment history at the Board and the relevant statute of limitations dates under the ADA and CFEPA.  Pl.'s Local Rule 56(a)1 Stmt. ¶ 12, ECF No. 79-2.

| Academic Year | Grade Taught | School |
|---|---|---|
| 2003-2004 | Fifth Grade | Nathan Hale Elementary School |
| 2004-2005 | Fifth Grade Until November 2004, then First Grade for the Rest of the Year | Nathan Hale Elementary School |
| 2005-2006 | Sixth Grade | Bennie Dover Jackson Middle School |
| 2006-2007 | Sixth Grade | Bennie Dover Jackson Middle School |
| 2007-2008 | First Grade | Jennings Elementary School |
| 2008-2009 | First Grade | Jennings Elementary School |
| 2009-2010 | First Grade | Winthrop Elementary School (Jennings renamed) |
| 2010-2011 | First Grade | Winthrop Elementary School |
| 2011-2012     ADA: November 26, 2011     CFEPA: March 25, 2012 | First Grade | Winthrop Elementary School |
| 2012-2013 | First Grade | Winthrop Elementary School |
| 2013-2014 | Fifth Grade | Winthrop Elementary School |
| 2014-2015 | Fifth Grade | Winthrop Elementary School |
| 2015-2016 | Sixth Grade | Bennie Dover Jackson Middle School |

Mr. Wenc claims that, while he was teaching first grade from 2004 to 2005 and 2007 to 2008, he had difficulty managing the classroom physically and "had trouble with his legs."  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 37, 40, ECF No. 79-2.  The Board contends that it was not aware of these difficulties.  Def.'s Local Rule 56(a)2 Stmt. ¶¶ 37, 40, ECF No. 89-1.

When Mr. Wenc transferred from teaching sixth to first grade in Fall 2007, he told the Board that he was "displeased" with the work and that "the physical nature of the first grade" was not a good fit for him.  Def.'s Local Rule 56(a)(1) Stmt. ¶¶ 37-38; Def.'s Ex. H, Letter from

Mr. Wenc at 3. In a letter dated June 11, 2008, Mr. Wenc expressed an interest in teaching sixth grade, citing his physical handicap as the reason for the request. Pl.'s Local Rule 56(a)1 Stmt. ¶ 35, ECF No. 79-2; Def.'s Local Rule 56(a)1 Stmt. ¶¶ 39-40; Def.'s Ex. I, E-mail Dated June 11, 2008. The Board did not grant this request, and Mr. Wenc remained a first grade teacher for the following school year. Pl.'s Local Rule 56(a)1 Stmt. ¶ 36, ECF No. 79-2; Def.'s Local Rule 56(a)1 Stmt. ¶ 43.

During this time, the Board also identified some problems with Mr. Wenc's performance as a teacher. Mr. Wenc's performance evaluation from the 2006 to 2007 school year, while he was teaching sixth grade, identifies some deficient areas of his performance. Def.'s Ex. F, Final Evaluation Rep. dated May 17, 2007; *see also* Def.'s Local Rule 56(a)1 Stmt. ¶¶ 31-33. Despite these comments in his review, the Board granted Mr. Wenc tenure at the end of the year. Def.'s Local Rule 56(a)1 Stmt. ¶ 35. Both sides agree he then received positive performance reviews for the 2007 to 2008 and 2008 to 2009 school years. Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 13-14, ECF No. 79-2.

During the 2009 to 2010 school year, Mr. Wenc was placed on a "performance plan," due to some performance issues at the beginning of the year, that he successfully completed. Def.'s Ex. B, Wenc Dep. 109:25-112:15. The record reveals no performance issues going into the 2010 to 2011 school year. Def.'s Ex. E, Wilson Dep. 52:5-7 (testifying, as Mr. Wenc's supervisor, that he had no performance issues by the end of the 2009 to 2010 school year).

### C.  Facts Relevant to Mr. Wenc's Claims[2]

Mr. Wenc taught first grade for the 2011 to 2012 and 2012 to 2013 school years. In Spring 2010 and Fall 2011, Mr. Wenc's supervisor, Jaye Wilson, testified that the Board had

---

[2] As noted above, Mr. Wenc's ADA claim must be based on the Board's conduct after November 26, 2011 and his CFEPA claim on conduct after March 25, 2012. This section includes facts that are relevant to the Board's actions during those timeframes.

observed some problems with Mr. Wenc's performance.  Def.'s Ex. E, Wilson Dep. 81:5-82:4.

As a result of these issues, the Board placed Mr. Wenc on "Level I" of the performance

assistance plan in September 2011.  *Id.*; Def.'s Ex. L, E-mail dated Sept. 29, 2011.  The Board

placed teachers on such plans when they underperformed.  Def.'s Local Rule 56(a)1 Stmt.¶¶ 4-

10.[3]  In December 2011, the Board placed him on "Level II" of the performance assistance plan

due to continued poor work performance.  Def.'s Ex. A, Chery Aff. ¶ 14 (Mr. Wenc was placed

on a "Level II: Assistance Plan" on December 9, 2011); Def.'s Ex. P, Assistance Plan,

Notification of Change of Evaluation Status dated Dec. 9, 2011.  Level I is designed to promote

awareness of performance issues; Level II is designed to ensure that the teacher corrects any

issues and meets performance standards.  Def.'s Local Rule 56(a)1 Stmt. ¶¶ 10-12.  Ms. Wilson

testified that she placed Mr. Wenc on these performance assistance plans, because of deficiencies

with "classroom management, lesson planning, [and] . . . organizational issues."  Def.'s Ex. E,

Wilson Dep. 38:20-39:1, 82:1-4.[4]

On December 13, 2011, Mr. Wenc formally asked the Board to transfer him to sixth

grade, because, in his view, teaching first grade harmed his leg and placement in sixth grade was

more appropriate, given his physical disability.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 60-63, 70, ECF

No. 79-2; Def.'s Ex. T, Letter dated Dec. 13, 2011.[5]  On December 23, 2011, Mr. Wenc also

expressed an interest in an open sixth grade teaching position at Bennie Dover Jackson Middle

School.  Pl.'s Local Rule 56(a)1 Stmt. ¶ 65, ECF No. 79-2.  He followed up on December 27,

2011 by letter and explicitly requested a transfer to this open position.  *Id.* ¶¶ 66-67.

---

[3] This particular evaluation structure was first developed for the 2010 to 2011 school year.  Def.'s Local Rule 56(a)1 Stmt. ¶ 5.

[4] Mr. Wenc contends that part of these criticisms derive from his disability, because they depend on his level of mobility around the classroom.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 47-48, ECF No. 79-2.

[5] He had also noted a desire to transfer to sixth grade on December 5, 2011, in response to the Board's request for his employment plans for the following school year.  Def.'s Ex. A, Chery Aff. ¶¶ 15-16; Def.'s Ex. R, Anticipated Plans for 2012-2013.

The Board's superintendent and assistant superintendent denied Mr. Wenc's request for a transfer within ten days of receiving it. *Id.* ¶ 71. Dr. Nicholas Fischer, the Board's Superintendent, decided that, because Mr. Wenc was on a performance improvement plan at the time of the request, it would not be appropriate to transfer him to a different school, where he would need to work with a different supervisor. *See id.* ¶ 73; Pl.'s Ex. 2, Fischer Dep. 66:11-15, 119:17-20, ECF No. 79-5 ("I disagreed with the transfer, because I felt that he was trying to get away from his having been placed on a professional improvement plan by going to another principal."); Def.'s Ex. Q, Fischer Aff. ¶ 9 (noting that because Mr. Wenc was underperforming, he "needed to remain with the same primary evaluator"). Dr. Fischer also felt that sixth grade would not present less of a physical challenge to Mr. Wenc, as the Board's teaching model "requires all teachers to actively move around the classroom throughout the day." Def.'s Ex. Q, Fischer Aff. ¶ 10. However, the Board did not directly communicate its decision to deny Mr. Wenc the requested transfer until roughly six months later. Pl.'s Ex. 47, Wenc. Aff. ¶¶ 5,7, ECF No. 79-50; Pl.'s Ex. 3, Fischer Dep. 246:14-16, ECF No. 79-6.

On the same date that he requested a transfer to teach sixth grade, December 13, 2011, Mr. Wenc also sought a leave of absence from work because of a medical issue on the "distal aspect of his amputation stump." Pl.'s Local Rule 56(a)1 Stmt. ¶ 83, ECF No. 79-2. During the first half of the 2011 to 2012 school year, Mr. Wenc had developed a lesion on his amputation stump. *Id.* ¶45. To manage his condition, his physician, Dr. Bentz, recommended that he not use his prosthetic, use crutches, and keep weight off the stump as much as possible. *See e.g.*, Def.'s Ex. V, Letter dated Dec. 13, 2011; Def.'s Ex. X, Letter dated Dec. 30, 2011; *see also* Def.'s Ex. K, Bentz Dep. 45:15-20, 46:24-47:4. Dr. Bentz testified that, to ensure that Mr. Wenc rested and did not wear his prosthetic during this time, she believed that he should not work

while the condition healed.  Def.'s Ex. K, Bentz Dep. 46:1-47:13.  As a result, Mr. Wenc took a medical leave of absence that lasted from December 13, 2011 to November 16, 2012.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 83, 85-86, 93-94, 97, 143, ECF No. 79-2; Def.'s Ex. A, Chery Aff. ¶¶ 18, 20-28.[6]

During this time, Mr. Wenc provided a number of notes from his physician, Dr. Bentz, which explained the condition and reaffirmed the recommendation that Mr. Wenc take leave from work.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 83, 85-87, 93-94, ECF No. 79-2.  Dr. Bentz testified that Mr. Wenc's injuries had many causes and could have derived from an ill-fitting prosthetic and engaging in extreme movements, like bending.  Def.'s Ex. K, Bentz Dep. 39:2-24.[7]  In notes dated April 16, 2012 and August 29, 2012, Dr. Bentz specifically advised the Board that Mr. Wenc "needed to be transferred to teaching a higher grade level" because it would require less physical movement.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 96, 103, ECF No. 79-2; Pl.'s Ex. 19, Letter from Dr. Bentz dated Apr. 16, 2012, ECF No. 79-22; Pl.'s Ex. 20, Letter from Dr. Bentz dated Aug. 29, 2012, ECF No. 79-23.

Mr. Wenc also sought and received worker's compensation benefits for the physical injuries that required his leave of absence.  Def.'s Ex. W, Notice of Claim for Compensation (claiming an injury on the "lower left extremity" on December 1, 2011); Def.'s Ex. AA, Payment Listing (listing payments for temporary total disability); Def.'s Ex. YY, Stipulation of Worker's Compensation Payments.  His worker's compensation claim described the injuries as "recurring

---

[6] The leave Mr. Wenc took from December 13, 2011 through May 9, 2012 was paid sick leave.  Def.'s Ex. A, Chery Aff. ¶¶ 18, 20-24.  From May 10, 2012 to the end of the school year, Mr. Wenc was provided with leave under the Family and Medical Leave Act ("FMLA").  *Id.* ¶¶ 24-25.  At the beginning of the following school year, the first fifteen days of Mr. Wenc's leave was paid sick leave.  *Id.* ¶ 26.  The remainder of the leave he took during this school year, until November 16, 2012, was FMLA leave.  *Id.*

[7] Dr. Bentz also recommended that Mr. Wenc obtain a new prosthetic leg "to prevent further friction and breakdown of the area."  Def.'s Ex. BB, Letter dated Jan. 13, 2011.  Mr. Wenc, however, was not able to obtain a new prosthetic during the time period relevant to this lawsuit.  *See* Def.'s Ex. K, Bentz Dep. 88:9-11.

lesions/ulceration on amputated limb aggravated by working conditions."  Def.'s Ex. W, Notice of Claim for Compensation.

During his medical leave, Mr. Wenc also took several trips to New York City, largely for the purpose of auditioning for various acting roles in television series and commercials.  Def.'s Mot. for Summ. J. Br. 11-12 (listing the trips taken by Mr. Wenc from January to June 2012); Def.'s Local Rule 56(a)1 Stmt. ¶¶ 100-01, 103-08, 110 (same); Pl.'s Local Rule 56(a)2 Stmt. ¶¶ 100-01, 103-08, 110, ECF No. 93-1.  Dr. Bentz testified that she did not medically recommend this travel if it involved wearing his prosthetic for a prolonged period of time, because it could have slowed the healing process.  Def.'s Ex. K, Bentz Dep. 59:3-21, 60:2-4.  Mr. Wenc testified that during these trips, he was "off [his] feet most of the day" and that in order to travel to New York, he drove to Milford, took the train into Grand Central Station, and took a taxi to his destination from there.  Def.'s Ex. B, Wenc Dep. 154:14-16.  He noted that he used crutches during some of these trips, and wore his prosthetic leg on others for the entire course of a day. *Id.* at 156:2-11. He also testified that, because he was auditioning for roles for disabled individuals, "accommodations were provided to minimize physical activity."  Pl.'s Ex. 56, Wenc Aff. ¶ 15, ECF No. 93-11.

On January 20, 2012, after his December 2011 request for a transfer had already been denied, the Board's assistant superintendent wrote a letter to Mr. Wenc requesting a statement from his physician describing the nature of the claimed disability and any limitations applicable to his job.  Pl.'s Local Rule 56(a)1 Stmt. ¶ 84, ECF No. 79-2.

In February 2012, Mr. Wenc reiterated his request to be transferred to sixth grade in a letter describing his disabilities, his history with the Board, and his need for an accommodation. Def.'s Ex. FF, Letter dated Feb. 2012.  In the letter, Mr. Wenc also asked that he be removed

12

from the performance assistance plan, reasoning that his performance issues were caused by his inability to work with first graders effectively because of his disability. *Id.*

On June 7, 2012, Mr. Wenc made another request to be transferred to sixth grade as an accommodation for his disability. Pl.'s Local Rule 56(a)1 Stmt. ¶ 98, ECF No. 79-2; Def.'s Ex. LL, Letter dated June 7, 2012. He also sought a meeting to discuss the same and again asked to be removed from the performance plan. *Id.*

Mr. Wenc met with Dr. Fischer on July 5, 2012 and reiterated his request for a transfer. Pl.'s Local Rule 56(a)1 Stmt. ¶ 99, ECF No. 79-2. Dr. Fischer told him that he could only return to work in a first grade position, but agreed that Mr. Wenc should undergo a "Functional Capacity Assessment" completed by a physician. *Id.* ¶¶ 99-100. At this meeting, Dr. Fischer also suggested that Mr. Wenc use a wheelchair to assist him in moving around the classroom and that he could apply for Social Security disability, if he could not work. *Id.* ¶¶ 101, 114; Def.'s Local Rule 56(a)2 Stmt. ¶¶ 101, 114, ECF No. 89-1.

The Board hired Dr. Mustapha Kemal, a physiatrist[8], to complete the Functional Capacity Assessment of Mr. Wenc. Def. 's Local 56(a)1 Stmt. ¶ 137. After seeing Mr. Wenc twice, Dr. Kemal referred him to an occupational therapist, Jessica Babineau, to conduct the exam and report her findings to him. *Id.* ¶¶ 138-41. The examination was completed on October 4, 2012 and based on the results and his own examination of Mr. Wenc, Dr. Kemal sent a letter to the Board with his recommendations on November 1, 2012. *Id.* ¶¶ 140-42. In his November 1, 2012 letter, Dr. Kemal concluded that Mr. Wenc would require an accommodation of two classroom aides to teach first grade. Def.'s Ex. SS, Letter dated Nov. 1, 2012 from Dr. Kemal.[9]

---

[8] A physiatrist is a physician who specializes in physical medicine. *Random House Webster's Unabridged Dictionary* 1461 (2d ed. 2001)

[9] In the context of this case, Dr. Kemal testified that "Mr. Wenc was trying to be as helpful as possible and he was offered to have two aides help him in the first grade… So on a trial basis, I agreed to let him work with two aides."

He opined that Mr. Wenc would not require any additional accommodation to teach sixth grade. *Id.*

During the examination, Ms. Babineau observed that Mr. Wenc had trouble getting down, required support to get up, and had difficulty standing for a long period of time.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 133-34, ECF No. 79-2.  She found that Mr. Wenc had decreased mobility in his lower extremities and back and decreased dynamic balance.  *Id.* ¶¶ 137-38.  Ms. Babineau also opined that he should sit during the work day.  *Id.* ¶ 135.  During his meetings with Mr. Wenc, Dr. Kemal diagnosed him with chrondromalacia patella in his right leg, which is "a misalignment of the kneecap with the groove that is supposed to move when the knee is flexed or extended" and that leads to "arthritis and degeneration of the under surface of the knee cap."  Pl.'s Local Rule 56(a)1 Stmt. ¶ 121, ECF No. 79-2.  This condition is caused by "squatting or bending of the knee beyond ninety degrees."  *Id.* ¶ 123.  To manage this condition, Dr. Kemal advised Mr. Wenc to avoid kneeling on the floor, spending "excessive" period of time leaning down, and bending his knee repetitively.  *Id.* ¶ 124.  Dr. Kemal also diagnosed Mr. Wenc with gait disturbance and patellofemoral syndrome, which results in "knee pain, difficulty with prolonged flexion or extension of the knee, problems getting up from a sitting position, getting out of a car, standing up, and going up stairs."  *Id.* ¶¶ 125, 127.  The Board contends that it was unaware of any of these diagnoses and observations made by Ms. Babineau or Dr. Kemal at the time they were made.  Def.'s Local Rule 56(a)2 Stmt. ¶¶ 121, 123-25, 127, 133-35, 137-38.

Both Ms. Babineau and Dr. Kemal have testified in the course of this lawsuit that Mr. Wenc was better suited to teaching higher grade levels.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 120, 136, ECF No. 79-2.  The Board also contends that it did not know about these opinions when it

---

Pl.'s Ex. 8, Kemal Dep. 41:15-19, ECF No. 79-11.  He then testified that Mr. Wenc came back to him on September 24, 2012 and said that "even that accommodation is not working out."  *Id.* at 41:19-23.  There is no record evidence that he conveyed any of these facts to the Board in his letter or otherwise.

made decisions about Mr. Wenc's accommodations and employment.  Def.'s Local Rule 56(a)2 Stmt. ¶¶120, 136, ECF No. 89-1.

Mr. Wenc argues that the Board knew more than it admits when making decisions about how to accommodate him.  *See* Pl.'s Reply Br. 4-6, ECF No. 107.  In support of his position, Mr. Wenc refers to his medical records from two visits with Dr. Kemal.  Pl.'s Reply Br. 4-5, ECF No. 107 (citing Pl.'s Ex. 73, Kemal Medical Records dated 10/16/12 and 9/24/12, ECF No. 107-3).  Mr. Wenc's attorney indicates that he forwarded these additional medical records to the Board's attorney.  Pl.'s Ex. 72, Letter dated Oct. 22, 2012, ECF No. 107-2.

These additional records contain one recommendation, which was not in the November 1, 2012 letter, about not requiring Mr. Wenc to use a wheelchair.  Pl.'s Ex. 73, Kemal Medical Records, ECF No. 107-3 at 8 ("Mr. Wenc has been asked to consider a wheelchair.  I do not consider that as a medically viable option, for several reasons . . . .").  Otherwise, they do not substantively alter Dr. Kemal's recommendations as articulated in his November 1, 2012 letter or provide much additional information about his condition.  Instead, the reports merely summarize Mr. Wenc's views that first grade was more physically demanding and that having one or even two additional aides was insufficient for him to continue at that grade level.  *E.g.*, *id.* at 5, 8 ("Mr. Wenc strongly disagrees with the NLPS' contention that one assigned classroom aide can provide adequate assistance to manage this class size/grade… Mr. Wenc feels that even with two aides, it is not possible to provide adequate and meaningful teaching experience to first graders, with the extent of his disability."); *id.* at 6 ("He has not returned to work, as he contends that first grade teaching would put him at significant risk for recurrent injury . . . .").  Nowhere in the reports does Dr. Kemal adopt these views as his own.

Mr. Wenc returned to work on November 16, 2012 to teach first grade with two classroom aides—one dedicated to assisting him and one to working with a student with an "IEP." Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 143-44, 146, ECF No. 179-2; Def.'s Ex. A, Chery Aff. ¶ 28; Pl.'s Ex. 5, Chery Dep. 76:9-13, 93:3-10, ECF No. 79-8; Def.'s Local Rule 56(a)2 Stmt. ¶ 146. ECF No. 89-1; Def.'s Ex. YYY, Fischer Dep. 58:13-18, ECF No. 89-14 ("Q. And so the aides, the two aides that were provided for Mr. Wenc, for what purpose were they employed? A. One, as I recall, was to help with students who needed remediation help, but the second was based on the recommendation of Dr. Kemal.").[10] The parties dispute whether this approach was consistent with Dr. Kemal's recommendation. The Board argues that providing two aides in Mr. Wenc's classroom, no matter who they were assigned to assist in particular, complied with Dr. Kemal's recommendation. Def.'s Reply Br. 16, ECF No. 105; Def.'s Local Rule 56(a)2 Stmt. ¶ 146, ECF No. 89-1. Mr. Wenc's counsel argues that the Board failed to comply with Dr. Kemal's recommendation, because it did not provide him with two aides specifically dedicated to assisting him. Pl.'s Reply Br. 5-6, 8, ECF No. 107.

The text of Dr. Kemal's November 1, 2012 letter only provides that Mr. Wenc should have two aides, without otherwise defining the type of aide or what kinds of tasks they should perform. Def.'s Ex. SS, Letter dated Nov. 1, 2012 from Dr. Kemal ("It is my opinion, based on

---

[10] The parties dispute each other's characterizations of how many aides Mr. Wenc had, but there is no factual dispute that he had one aide assigned to his classroom to work with a particular student and one additional aide assigned to work with him directly. Pl.'s Ex. 41, E-mail dated Nov. 15, 2012, ECF No. 79-44 ("Jon Wenc is returning tomorrow morning. Please be sure that he has an additional aide in the classroom as an accommodation. We understand that there is already one aide assigned to a student on an IEP. We are asking that in addition to that aide in the classroom that there is always another fulltime aid[e] who will provide assistance to Jon in the classroom."); Def.'s Ex. YYY, Fischer Dep. 58:13-18, ECF No. 89-14 ("Q. And so the aides, the two aides that were provided for Mr. Wenc, for what purpose were they employed? A. One, as I recall, was to help with students who needed remediation help, but the second was based on the recommendation of Dr. Kemal."); *see also* Def.'s Ex. B, Wenc Dep. 253:5-14 ("All of the first grades would have an aide that would typically be assigned to a student or two who had certain modifications that require that they have another adult available… So I had an aide in the class, it was usually specifically for a child that's got a 504 Plan or a child that needs another adult available. So yes, there is always an adult there, but I don't want to say that I had that aide, but there would be another adult in the classroom, yes.").

reasonable medical probability, that Mr. Wenc will require the assistance of two classroom aides who can provide adequate needed assistance for first grade level students."). There is no testimony from him clarifying the meaning of his recommendation. The Board's Chief Human Resources Officer testified that she believed Dr. Kemal recommended two aides to be placed in the classroom, in addition to any aides assisting students on an "IEP." Pl.'s Ex. 5, Chery Dep. 76:9-13, ECF No. 79-8 ("Q. Now, would that be --- was it your understanding that the request for two aides was over and above any aides that were in the classroom for a student on an IEP? A. Yes."); Def.'s Ex. A, Chery Aff. ¶ 3. There is also evidence indicating that the Board concluded that providing Mr. Wenc with two additional aides was "unreasonable." Pl.'s Ex. 5, Chery Dep. 76:17-21, ECF No. 79-8; Pl.'s Ex. 40, E-mail dated Nov. 14, 2012, ECF No. 79-43 ("The school system does not consider the second aide to be reasonable and also not legally warranted because the aides would be serving to take over essential duties that Wenc would be expected to perform as a classroom teacher.").

However, Mr. Wenc himself admits that the Board complied with Dr. Kemal's recommendation and that he was satisfied with the aides it provided him. Def.'s Ex. B, Wenc Dep. 253:18-25 ("Q. And so the decision was to assign a second aide to the classroom… And this was in line with Dr. Kemal's recommendation. Correct? A. Yes."), 255:20-21 ("I was satisfied with my aides."). And Dr. Fischer also testified that the Board decided Mr. Wenc should return to work with two aides, consistent with Dr. Kemal's recommendation. Def.'s Ex. Q, Fischer Aff. ¶ 19.

On at least five occasions from November 16, 2012 to February 21, 2013, Mr. Wenc was only left with one aide total in the classroom, as the other aide was engaged in other tasks. Def.'s Ex. A, Chery Aff. ¶ 30; Pl.'s Ex. 56, Wenc Aff. ¶ 21, ECF No. 93-11. Ms. Chery testified

that Mr. Wenc did not report any of these incidents to the Board when they occurred.  Def.'s Ex.

A, Chery Aff. ¶ 30.  Mr. Wenc has testified that he reported these incidents to the building

secretary.  Pl.'s Ex. 56, Wenc Aff. ¶ 21ECF, No. 93-11.

Mr. Wenc was placed on a "Level II" performance plan again in January 2013.  Def.'s

Ex. TT, Assistance Plan Notification of Change of Evaluation Status dated Jan. 7, 2013.  He then

took another medical leave of absence beginning February 21, 2013 through the end of the 2012

to 2013 school year.  Pl.'s Local Rule 56(a)1 Stmt. ¶ 148, ECF No. 79-2; Def.'s Ex. A, Chery

Aff. ¶ 36.[11]  Dr. Bentz had seen him on February 26, 2013, observed a new ulceration on his

amputation stump, and recommended that he take a leave from work to allow it to heal.  Pl.'s

Local Rule 56(a)1 Stmt. ¶ 149, ECF No. 79-2; Pl.'s Ex. 21, Letter from Dr. Bentz dated Mar. 7,

2013, ECF No. 79-24.  In additional letters dated March 19, 2013, June 18, 2013, and August 15,

2013, she also recommended that he be placed in a higher grade level where there "is less

movement required."  Pl.'s Ex. 22, Letter dated Mar. 19, 2013, ECF No. 79-25; Pl.'s Ex. 23,

Letter from Dr. Bentz dated June 18, 2013, ECF No. 79-26; Pl.'s Ex. 24, Letter from Dr. Bentz

dated Aug. 15, 2013, ECF No. 79-27.

Mr. Wenc also applied for and received worker's compensation benefits during this

leave.  Def.'s Ex. WW, Notice of Claim for Compensation (claiming injury on "lower left" and

"lower right" extremities on February 21, 2013); Def.'s Ex. YY, Stipulation of Worker's

Compensation Payments.  He described the injury on his notice of claim as "recurring

lesions/ulceration on amputated left leg… overuse syndrome and aggravation to right leg" that

constituted a "temporary total disability."  Def.'s Ex. WW, Notice of Claim for Compensation.

As with the first leave period, Mr. Wenc traveled on several occasions during this medical leave

---

[11] By this time, Mr. Wenc had taken all of his FMLA leave for the year, but the Board granted him additional unpaid
leave.  Def.'s Ex. A, Chery Aff. ¶31.

to various locations primarily for the purpose of auditioning for acting roles. Def.'s Mot. for Summ. J. Br. 16-17 (listing trips taken by Mr. Wenc from February to June 2013); Def.'s Local Rule 56(a)1 Stmt. ¶¶169-172 (same); Pl.'s Local Rule 56(a)2 Stmt. ¶¶169-172, ECF No. 93-1.

On March 29, 2013, Mr. Wenc requested again to be transferred to teach sixth grade, this time through his legal counsel, as he had already filed a complaint with the EEOC and CHRO. Pl.'s Local Rule 56(a)1 Stmt. ¶¶ 147, 150, ECF No. 79-2. In the alternative, he asked the Board to provide him with "[an]other reasonable accommodation for his disability." *Id.* ¶ 150. He reiterated this request for transfer on May 30, 2013. *Id.* ¶ 151.

On June 11, 2013, the Board and Mr. Wenc's legal representatives met, and the Board asked for additional medical opinion regarding any reasonable accommodation he needed. *Id.* ¶ 152. Dr. Bentz sent the Board a letter roughly a week later, recommending that Mr. Wenc be moved to teach "an upper level elementary grade." *Id.* ¶153. In addition, Mr. Wenc's supervisor who had been working with him on his performance assistance plan, Ms. Wilson, retired at the end of the 2012 to 2013 school year. Def.'s Ex A. Chery Aff. ¶ 41.

At the June 11, 2013 meeting, the Board decided to transfer Mr. Wenc to teach fifth grade for the 2013 to 2014 school year. *Id.* ¶ 37; Pl.'s Local Rule 56(a)1 Stmt. ¶¶154, 156, ECF No. 79-1. The Board also agreed to provide Mr. Wenc with two classroom aides, a swivel wheeled chair, at Mr. Wenc's request, and a wheelchair during this school year. Def.s' Local Rule 56(a)1 Stmt. ¶¶ 181-82; Def.'s Ex. A, Chery Aff. ¶ 37; Def.'s Ex. B, Wenc Dep. 278:13-23.

## II.      Motions for Summary Judgment (ECF Nos. 77, 79)

Mr. Wenc asserts four legal claims against the Board in this lawsuit. He claims that the Board violated the ADA and CFEPA by failing to provide him with a reasonable accommodation for his disability promptly. Am. Compl. at Counts One and Three, ECF No. 19. Mr. Wenc has

affirmatively moved for summary judgment on these claims only, arguing that the only reasonable conclusion that could be drawn from the record evidence is that the Board failed to reasonably accommodate his disability, in violation of both statutes.  The Board has also moved for summary judgment in its favor on these claims, contending that no reasonable juror could conclude that it failed to accommodate him reasonably.

Mr. Wenc also claims that the Board retaliated against him for requesting transfers to a higher grade level as an accommodation for his disability in violation of CFEPA and the ADA. *Id.* at Counts Two and Four.  The Board has moved for summary judgment on this claim, which Mr. Wenc opposes.

Aside from Connecticut law's broader definition of disability, which is irrelevant here, courts construe discrimination and retaliation claims brought under CFEPA similarly to such claims brought under the ADA.  *See Hopkins v. New Eng. Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 255 (D. Conn. 2013) (discrimination and retaliation claims brought under CFEPA and the ADA are analyzed in the same way); *Beason v. United Techs. Corp.*, 337 F.3d 271, 277-78 (2d Cir. 2003) (noting that CFEPA's definition of disability is broader than the definition under the ADA); *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 205, 206 (D. Conn. 2013).  Thus, the Court will treat Mr. Wenc's CFEPA and ADA claims as the same in resolving the summary judgment motions.

### A.  Standard

A party who moves for summary judgment bears the burden of establishing that there are no genuine issues of material fact in dispute and that he is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When ruling on a motion for summary judgment, the Court must construe all facts in the light

most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law" and is "genuine" if it could cause a reasonable jury to return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 248.  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

In deciding cross-motions for summary judgment, the Court applies the same standard to both motions.  *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Id.*

### B.  Reasonable Accommodation Claims under the ADA and CFEPA (Counts One and Three)

The ADA and CFEPA prohibit employers from discriminating against employees on the basis of their disabilities in making employment decisions.  42 U.S.C. § 12112(a); Conn. Gen. Stat. § 46a-60(a)(1).  The ADA defines discrimination to include a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).  CFEPA prohibits the same, and reasonable accommodation claims under both statutes are analyzed in the same way.  *See Martinsky v. City of Bridgeport*, 814 F. Supp. 2d 130, 145 (D. Conn. 2011) (citing *Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 403-04 (2008)).

Mr. Wenc claims that the Board failed to reasonably accommodate his disability in (1) delaying discussing an accommodation for him at various stages; (2) failing to give him two teaching aides; and (3) refusing to transfer him from teaching first to sixth grade for nineteen months.  Pl.'s Mot. for Summ. J. Br. 18-35, ECF No. 79-1; Pl.'s Opp. Br. 25-34, ECF No. 93. For his claims under the ADA and CFEPA to survive summary judgment, Mr. Wenc must show that a genuine question of material fact exists on all of the following elements of his prima facie case: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *McMillan v. City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013) (internal quotation marks and citations omitted) (articulating the elements of plaintiff's prima facie case).

The Board concedes that Mr. Wenc is disabled for purposes of the ADA and that it knew about his disability.  It argues that Mr. Wenc has failed to meet his burden on the third and fourth elements in that he was not qualified to perform the essential functions of his job, Def.'s Mot. for Summ. J. Br. 25-34, 35-37, and it reasonably accommodated his disability to the fullest extent required by law, *id.* at 37-48.  Because the Court agrees that the Board provided a series of reasonable accommodations that were sufficient under the ADA and CFEPA, it grants summary judgment in the Board's favor on Mr. Wenc's reasonable accommodation claims.

### 1.  Employer's Refusal to Provide Reasonable Accommodation

The Board contends that the Court must grant summary judgment in its favor on Mr. Wenc's reasonable accommodation claims, because it provided him with a number of plainly reasonable accommodations, including two extended leaves of absence, two classroom aides, and

ultimately a transfer to fifth grade with teaching aides, a wheelchair, and a swiveling office chair.
Def.'s Mot. for Summ. J. Br. 38.  It argues that the law does not require an employer to do more.
As noted above, Mr. Wenc responds that the Board failed to provide him with sufficient
accommodations because (1) it delayed unreasonably in providing him with a reasonable
accommodation and in engaging in an interactive process with him to develop a proper
accommodation, (2) it did not provide him with the two teaching aides recommended by Dr.
Kemal, and (3) it did not transfer him to teach a higher grade level earlier.  Pl.'s Br. 18-35, ECF
No. 79-1; Pl.'s Opp. Br. 25-34, ECF No. 93.  For the reasons that follow, the Court agrees with
the Board and grants summary judgment on Mr. Wenc's reasonable accommodation claims
under the ADA and CFEPA.

Under the ADA and CFEPA, employers are required to provide reasonable
accommodations to their disabled employees that do not impose an undue hardship on the
employer.  42 U.S.C. § 12112(b)(5)(A); *see also Martinsky*, 814 F. Supp. 2d at 145 (analysis of
reasonable accommodation claims is the same under the ADA and CFEPA).  A reasonable
accommodation "enable[s] an individual with a disability who is qualified to perform the
essential functions of [his] position… [or] to enjoy equal benefits and privileges of employment
as [they] are enjoyed by [the employer's] other similarly situated employees without
disabilities."  29 C.F.R. §1630.2(o)(1)(ii), (iii).  But it need not "perfect[ly] eliminat[e] [ ] all
disadvantage that may flow from the disability" or "lower [ ] standards."  *Fink v. New York City
Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995) (analyzing the Rehabilitation Act).[12]

The reasonableness of an employer's accommodation is often a fact question for the jury.
*See Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015).  But where the "employer

---

[12] The term reasonable accommodation has the same meaning under the Rehabilitation Act and the ADA.  *Lyons v.
Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995).

has already taken . . . measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Id.*

An employee has no right under the ADA or CFEPA to the accommodation of his choice, so long as the accommodation he receives is reasonable. *See Fink*, 53 F.3d at 567 (The Rehabilitation Act "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable."); *Cormier v. City of Meriden*, 420 F. Supp. 2d 11, 21 (D. Conn. 2006) ("[T]he ADA does not necessarily entitle plaintiff to her preferred accommodation so long as the offered one does not create a significant burden on her."); *Noll*, 787 F.3d at 98 ("[T]he ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable."). Indeed, it is the employer and not the employee that has discretion to choose the accommodation. *See* 29 C.F.R. pt. 1630, appendix ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.").

A delay in providing a reasonable accommodation can also violate the ADA, if that delay is caused by discriminatory animus and is sufficiently lengthy to constitute a constructive denial of a reasonable accommodation. *See Austin v. Town of Farmington*, Docket No. 15-2238-cv, ____ F. 3d ____, 2016 WL 3453836, at *6 (2d Cir. June 21, 2016) (a delay in providing an accommodation under the Fair Housing Act can constitute a failure to provide a reasonable accommodation in violation of the Act); *see also e.g. Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 260 (S.D.N.Y. 2015) (noting that courts in the Second Circuit have held that delay

in providing an accommodation can sustain an ADA claim if the plaintiff can show that "the delay was motivated by the employer's discriminatory intent, as opposed to mere negligence."); *Saunders v. Queensborough Cmty. Coll.*, No. 13 CV 5617(PKC)(RML), 2015 WL 56555719, at *7 n.8 (E.D.N.Y. Sept. 24, 2015) (explaining that claims of constructive denial based on delay are "viable even if the employer ultimately grants the accommodation request" and that a plaintiff must show that the delay was "motivated by discriminatory intent rather than 'mere bureaucratic incompetence' or negligence.").

Here, the record demonstrates that the Board provided a number of plainly reasonable accommodations with little, if any delay.  Thus, summary judgment is appropriate on Mr. Wenc's claims because the Board provided him all of the reasonable accommodations the ADA and CFEPA required.

The relevant events in this case may be briefly summarized as follows:

- November 26, 2011: The statute of limitations on Mr. Wenc's ADA claim begins to run.

- December 13, 2011: Mr. Wenc sought a transfer to sixth grade to accommodate his disability.  He also sought medical leave on the same day and provided a note from his physician, Dr. Bentz, in support of his request.  The Board provided him with a medical leave.  Mr. Wenc renewed that leave numerous times, supported by notes from Dr. Bentz and resulting in him being on medical leave until November 16, 2012.

- March 25, 2012: The statute of limitations on Mr. Wenc's CFEPA claim begins to run.

- July 15, 2012:  The Board met with Mr. Wenc to discuss future accommodation of his disability.

25

- August - October 2012: Dr. Kemal evaluated Mr. Wenc.

- November 1, 2012: Dr. Kemal opined on reasonable accommodations for Mr. Wenc.

- November 16, 2012: Mr. Wenc returned to work with two aides in his classroom, one directly assigned to assist him and one assigned to work with a student in his classroom.

- February 25, 2013: Mr. Wenc sought and received additional medical leave, supported by a note from Dr. Bentz.  Again, he made successive requests for medical leave that resulted in him being out for the rest of the school year, again supported by additional notes from Dr. Bentz.

- Fall 2013: When Mr. Wenc returned to work, the Board transferred him to teach fifth grade.

As this summary demonstrates, as soon as Mr. Wenc voiced his concerns about his ability to work because of his disability, he sought and received a medical leave for the remainder of the school year.  Temporary leaves of absence—whether they are paid or unpaid—can provide a reasonable accommodation under the ADA where the leave will likely enable an employee to return to work.  *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 185 & n.5 (2d Cir. 2006) (noting that the Second Circuit has not directly decided the matter but that "[m]ost other circuits and the Equal Employment Opportunity Commission" have "concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work.")[13]; *Criado v. IBM Corp.*, 145 F.3d 437, 443 (1st Cir. 1998) (" A

---

[13] The Second Circuit also noted that providing leaves of absence as accommodations under the ADA presents a "'troublesome problem, partly because of the oxymoronic anomaly it harbors—the idea that allowing a disabled employee to leave a job allows him to perform that job's functions.'"  *Id.* (quoting *Garcia-Ayala v Lederle Parenterals, Inc.*, 212 F.3d 638, 651-52 (1st Cir. 2000) (O'Toole, J., dissenting).  The Second Circuit has also ruled that the ADA does not require indefinite leaves of absence as accommodations.  *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 9 (2d Cir. 1999).

leave of absence and leave extensions are reasonable accommodations in some circumstances.");

*Hutchinson v. Ecolab, Inc.*, Civil No. 3:09cv1848(JBA), 2011 WL 4542957, at *9 (D. Conn.

Sept. 28, 2011) ("A medical leave of absence is a recognized form of accommodation . . . .")

(collecting cases); 29 C.F.R. pt. 1630, appendix ("[A]ccommodations could include permitting

the use of accrued paid leave or providing additional unpaid leave for necessary treatment . . .

."); *McNamara v. Tourneau, Inc.*, 496 F. Supp. 2d 366, 376 (S.D.N.Y. 2007) ("[A]n unpaid leave

of absence can be a reasonable accommodation under the ADA, where 'it is finite and will be

reasonably likely to enable the employee to return to work.'") (collecting cases); *Sobhi v.

Sociedad Textil Lonia Corp.*, No. 13 Civ. 8073(AT)(MHD), 2014 WL 7474338, at *5 (S.D.N.Y.

Dec. 30, 2014) (finding the same).

Providing Mr. Wenc with a leave of absence in this case was reasonable.  Throughout

both time periods during which he was on leave, he affirmatively sought that leave and provided

doctor's notes supporting it.  The doctor's notes indicated that the leave was necessary, on a

temporary basis, to allow Mr. Wenc's lesions to heal.  Leaves of absence are reasonable

accommodations in those circumstances.  *See Criado*, 145 F.3d at 444 (finding that a temporary

leave of absence was a reasonable accommodation because it would allow plaintiff's physician

"to design an effective treatment program."); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212

F.3d 638, 649 (1st Cir. 2000) (reversing a denial of summary judgment in the defendant's favor

because the provision of an extended, unpaid leave of absence was a reasonable accommodation,

and no reasonable juror could conclude otherwise); *cf. Conoshenti v. Pub. Serv. Elec. & Gas Co.*,

364 F.3d 135, 151 (3d Cir. 2004) (observing that a leave of absence can be a reasonable

accommodation under the ADA where it "would enable the employee to perform his essential

job functions in the near future.").  While Mr. Wenc was out of work for many months, the

27

doctor's notes did not on their face indicate that would be the case.  Instead, they contemplated a temporary leave period so that Mr. Wenc could heal and then return to work.  Thus, the Board's actions in granting him leave were reasonable under the circumstances.

When Mr. Wenc returned to work after his first medical leave in November 2012, the Board provided him with two aides in his classroom, one who was specifically assigned to assist him and another who was assigned to work with a student in his classroom.  Mr. Wenc's counsel argues that this accommodation was unreasonable because it did not comply with Dr. Kemal's recommendation for two aides.  But Mr. Wenc himself admits that it complied with that recommendation.  Moreover, nowhere in the record does Dr. Kemal clarify or address whether one of the aides assigned to Mr. Wenc's classroom could be assigned to work with a student or whether the Board complied with his recommendation.

On this record, no reasonable juror could conclude that the Board failed to comply with Dr. Kemal's recommendation.  And because the Board complied with Dr. Kemal's recommendation, it provided Mr. Wenc with a plainly reasonable accommodation after he returned from his first leave of absence.  *See Bielski v. Green*, 674 F. Supp. 2d 414, 425-26 (W.D.N.Y. 2009) (observing that because the defendant's accommodation was "consistent with" the advice of plaintiff's physician, summary judgment on plaintiff's reasonable accommodation claim was appropriate); *see also D'Amico v. New York State Bd. of Law Examiners*, 813 F. Supp. 217, 223 (W.D.N.Y. 1993) ("[I]n a case where there is no medical evidence to the contrary, and the treating physician's opinion does not appear on its face to be outrageous, it is appropriate for the Court to give great weight to the physician's opinion as to the nature of the accommodations required for his patient.").

Mr. Wenc did testify that, on a handful of occasions, he was left with only one aide in the classroom.  However, as noted above, the Board did not need to provide a perfect accommodation, merely a reasonable one.  *See Fink*, 53 F.3d at 567; *Noll*, 787 F.3d at 95 ("[E]mployers are not required to provide a perfect accommodation…. All that is required is effectiveness.").  Providing Mr. Wenc with teaching aides, consistent with Dr. Kemal's recommendation, was plainly reasonable.  There is no record evidence showing that the Board's failure to implement the accommodation perfectly makes it any less reasonable.  *See e.g.*, *De Jesus-Sanchez v. Taber Partners I, LLC*, 551 F. Supp. 2d 136, 140 (D. P.R. 2007) (holding that defendant provided a reasonable accommodation of giving the plaintiff regular breaks during his shift, even though the person who replaced him while he was taking his breaks was late on eight occasions over a five-year period).

Finally, when Mr. Wenc returned from his second leave in Fall 2013, he was transferred to teach at a higher grade level, which is the precise accommodation he sought.  He remained in that position for the rest of the school year and does not challenge the reasonableness of this accommodation that the Board ultimately provided.

Thus, from December 13, 2011, when he first raised concerns about his disability, through the date this lawsuit was filed in June 2014, Mr. Wenc received a number of plainly reasonable accommodations for his disability on a continuous basis.  As a result, in this case, the failure to provide the transfer he wanted immediately does not mean that the Board failed to reasonably accommodate him.  *See Wildman v. Verizon Corp.*, No. 1:05-CV-899 (FJS/DRH), 2009 WL 104196, at *2 n.3 (N.D.N.Y. Jan. 14, 2009) ("Where an employee provides an interim reasonable accommodation, its delay in providing accommodation is not a failure to accommodate.") (citing *Ungerleider v. Fleet Morg. Grp. of Fleet Bank*, 329 F. Supp. 2d 343,

354-55 (D. Conn. 2004)); *see also Trepka v. Bd. of Educ.*, 28 F. App'x 455, 460 (6th Cir. 2002) (affirming a district court's grant of summary judgment in favor of the defendant where a school board provided alternative accommodations, rather than the specific accommodation plaintiff requested, and plaintiff offered no evidence regarding the "adequacy" of the alternatives).

Mr. Wenc contends that the Board should have given him the other, additional accommodation he sought—a transfer to teach a higher grade level—immediately rather than providing him with various alternatives.  In particular, he argues that the medical leaves he took could have been shortened if he had been transferred to teach a higher grade level earlier.  In other words, he argues that the leave was not an effective accommodation and that a transfer would have been effective.

But the law does not require an employer to provide the best or the employee's preferred accommodation, merely a reasonable one.  *See Noll*, 787 F.3d at 95, 98; *Fink*, 53 F.3d at 567.  As described above, the Board did just that.  There is also no record evidence indicating that any physician ever told the Board that Mr. Wenc could have returned from his leave sooner had he been transferred to a higher grade level earlier.  While some of Dr. Bentz's notes argue that Mr. Wenc should have been transferred, they do not articulate any link between a failure to transfer him and the need for additional medical leave.  They merely advocate, as a separate matter, for Mr. Wenc's transfer.  Thus, there is no evidence in the record demonstrating that the Board's decision to provide medical leave, instead of the transfer, was unreasonable.

Mr. Wenc also argues that, under *Borkowski v. Valley Central School District*, 63 F.3d 131 (2d Cir. 1995), the Board had an obligation to evaluate Mr. Wenc's request to be transferred as an accommodation.  He argues that because the transfer accommodation was facially reasonable, in that its costs did not outweigh its benefits, the Board has the burden of persuading

a factfinder in this case that his proposed accommodation is unreasonable.  Pl.'s Br. 26-27, ECF No. 79-1.  The Court disagrees that this standard applies to this case.

Where an employer has not provided any accommodation at all to a disabled plaintiff, the plaintiff bears the burden of production only to show that a reasonable accommodation exists, which on its face, provides a benefit proportional to its cost.  *Borkowski*, 63 F.3d at 138.  Once the plaintiff has suggested such an accommodation, the defendant has the burden of "persuading the factfinder" that the proposed accommodation is unreasonable or would subject the employer to an undue hardship.  *Id.*

However, where the employer has taken other measures to accommodate the plaintiff's disability, the employer is entitled to summary judgment, if the undisputed facts show that the accommodations were "plainly reasonable."  *Noll*, 787 F.3d at 94, 98.  In this context, the employer has no legal obligation to explore the plaintiff's suggested accommodation so long as the accommodation it actually provided is reasonable.  *Id.*  As explained above, a reasonable juror could not conclude from this record that the accommodations that the Board provided were unreasonable.  Thus, the Board is not liable for failing to provide Mr. Wenc with reasonable accommodations, even without evaluating the reasonableness of Mr. Wenc's requested transfer.

Finally, to the extent that Mr. Wenc argues that the Board's delay in engaging in the "interactive process" alone constitutes a violation of the ADA and CFEPA, the Court disagrees. Once an employee raises a disability, the ADA and CFEPA contemplate that the employee and employer may need to engage in an interactive process to determine an appropriate accommodation.  *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) ("The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonable accommodated.");  *Brady v. Wal-*

31

*Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) ("We have held that the ADA contemplates that employers will engage in an 'interactive process' with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated.") (alterations and citation omitted);  29 C.F.R. pt. 1630, appendix ("The appropriate reasonable accommodation is best determined through a flexible interactive process that involves both the employer and the [employee] with a disability.").

However, if an employer is providing a reasonable accommodation, the failure to engage in an interactive process with its employee cannot violate the ADA alone.  *See Noll*, 787 F.3d at 98 (holding that, because the defendant provided a reasonable accommodation to the plaintiff, "any failure to engage in an interactive process—even if supported by the record—did not give rise to a discrimination claim [under the ADA]").  Thus, the fact that the Board did not meet with Mr. Wenc while he was out on medical leave, did not violate the ADA or CFEPA, because the Board was providing him with reasonable accommodations at the time.

Accordingly, for all of the reasons articulated above, the Court grants summary judgment on Mr. Wenc's reasonable accommodation claims under the ADA and CFEPA, because no reasonable juror could conclude from this record that the Board failed to reasonably accommodate his disability.

## C.  Retaliation Claims under the ADA and CFEPA (Counts Two and Four)

Mr. Wenc contends that the Board retaliated against him for requesting a transfer to an open sixth grade position in December 2011 as an accommodation for his disability, in violation of the ADA and CFEPA.  Pl.'s Opp. Br. 35, ECF No. 93.  He contends that he suffered an adverse employment action "when he was forced to stay out on medical leave" when the Board denied his request for a transfer.  *Id.* at 35-37.

The Board argues that Mr. Wenc did not suffer an adverse employment action, Def.'s Mot. for Summ. J. Br. 49-51, there was no causal connection between a protected activity and any adverse employment action, *id.* at 52-53, and it has provided a legitimate, non-retaliatory reason for any adverse action it took against him, *id.* at 53-54. Because the Court agrees that Mr. Wenc cannot show he suffered an adverse employment action, it grants summary judgment on his retaliation claims.

To survive summary judgment on his retaliation claim under the ADA, Mr. Wenc must show that a genuine question of material fact exists as to all of the following elements of his prima facie case: "(1) [he] was engaged in an activity protected by the ADA, (2) [his] employer was aware of that activity, (3) an employment action adverse to [him] occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999) (articulating elements of a plaintiff's prima facie case). The same standard applies to Mr. Wenc's CFEPA retaliation claim. *See e.g.*, *Marini v. Costco Wholesale Corp.*, 64 F. Supp. 3d 317, 332 (D. Conn. 2014) (citing *Widomski v. State Univ. of New York (SUNY) at Orange*, 748 F.3d 471, 476 (2d Cir. 2014)); *Worster v. Carolson Wagon Lit Travel, Inc.*, 353 F. Supp. 2d 257, 270 (D. Conn. 2005) (citing *Brittell v. Dep't of Correction*, 247 Conn. 148, 16364 (1998)). "An adverse employment action is more disruptive than a mere inconvenience or an alteration of job responsibilities. It is a *materially significant disadvantage* with respect to the terms of [the plaintiff's] employment." *Littlejohn v. City of New York*, 795 F.3d 297, 312 n.10 (2d Cir. 2015) (citation and internal quotation marks omitted and alteration in original).

Here, the Board provided Mr. Wenc with a series of reasonable accommodations throughout the time period relevant to this case. These accommodations do not constitute

adverse employment actions because they did not disadvantage him in a materially significant way.  In fact, as the Court discussed above, they accommodated his disability in a reasonable way.  Mr. Wenc confuses the allegedly discriminatory action of failing to accommodate his disability with retaliation for seeking an accommodation.

The record also does not support the notion that Mr. Wenc was "forced" to take medical leave.  In essence, Mr. Wenc argues that because he preferred a different accommodation, a transfer, that his decision to accept the accommodation the Board provided was "forced."  An employer, however, has discretion to choose a reasonable accommodation for its disabled employees, and the provision of a leave of absence was reasonable here.  *See Fink*, 53 F.3d at 567; *Noll*, 787 F.3d at 98.

Moreover, Mr. Wenc affirmatively applied for each leave of absence and numerous extensions of these leaves of absence, which were supported by letters from Dr. Bentz indicating that they were medically necessary.  *See e.g.*, Pl.'s Ex. 14, Letter from Dr. Bentz dated Dec. 13, 2011, ECF No. 79-17 ("I think it is in Jon's best interest to be out of work . . . to enable him to not wear his prosthetic leg as much as humanly possible and be as 'non-weight-bearing' as he can be . . . .").[14]  In other words, the Board continued to accommodate Mr. Wenc before and after the request for a transfer that is at issue in the same way.  Thus, no reasonable jury could conclude that his request for an accommodation caused the Board not to accommodate him.  *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (finding that

---

[14] Indeed, given that Mr. Wenc applied for some of his leaves of absence under the FMLA, the Board could have been held liable for interference with his FMLA rights had they denied these requests for leave.  *See generally Graziadio v. Culinary Institute of America*, 817 F.3d 415, (2d Cir. 2016) (observing that the FMLA prohibits an employer from denying or interfering with a benefit provided under the FMLA); *see also* 29 U.S.C. §2612(a)(1)(D) (the FMLA entitles eligible employees "to a total of 12 workweeks of leave during any 12-month period . . . "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.")

there can be no retaliation claim where a plaintiff's "situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint").

Because Mr. Wenc has failed to show that he suffered an adverse employment action, the Court must grant summary judgment on his retaliation claims under the ADA and CFEPA.

### III.   Conclusion

For all of the foregoing reasons, the Board's Motion for Summary Judgment, ECF No. 77, is **GRANTED** on all of Mr. Wenc's claims, and Mr. Wenc's Motion for Summary Judgment, ECF No. 79, is **DENIED**.  The Board's Motion to Amend its Answer, ECF No. 99, is **DENIED AS MOOT**.  The Clerk is directed to enter judgment for the Defendant and close the case.


**SO ORDERED** this sixteenth day of August 2016 at Bridgeport, Connecticut.

 /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE